IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

SABRINA S.,

        **Plaintiff,**

  v.                                      Civil Action 3:24-cv-00062
                                                Judge Walter H. Rice
                                                Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Sabrina S., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 7) and **AFFIRM** the Commissioner's decision.

**I.  BACKGROUND**

Plaintiff filed her applications for DIB and SSI in May 2021, alleging that she was disabled beginning February 19, 2021, due to congestive heart failure, sciatica, high blood pressure, heart disease, chronic kidney disease, thyroid issues, and vitamin D deficiency. (R. at 244–54, 255–61, 293). After her applications were denied initially and on reconsideration, Administrative Law Judge Stuart Adkins (the "ALJ") held a telephonic hearing on February 27, 2023. (R. at 46–73). Ultimately, the ALJ denied Plaintiff's applications in a written decision on April 12, 2023. (R. at 21–45). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1–7).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on March 1, 2024. (Doc. 1). As required, the Commissioner filed the administrative record, and the matter has been fully briefed. (Docs. 6, 7, 9, 10).

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's testimony from the administrative hearing as follows:

> [Plaintiff] testified she is married and resides with her husband and one minor child, age 12. A combination of issues prevent her from working including fatigue and low energy due to sleep apnea for which she uses a CPAP machine. [Plaintiff] also has a thyroid disorder resulting in hair loss, fatigue, low energy, and problems with memory and concentration. She also wears braces and has had injections for carpal tunnel in both hands and anticipates surgery on her dominant right hand. Hand strength is weak and using her hands is complicated by flares of eczema treated with a topical ointment. Shoulder pain, also greater on the right, limits her reaching abilities. Due to back and leg pain as well as heart failure she has difficulty standing/walking for prolonged periods and cannot sit longer than 30 minutes.
>
> Typically, [Plaintiff] is only to do household chores such as laundry relying on her 12-year old child and with frequent breaks. She also relies on her husband for some personal care needs requiring bending or overhead reaching. When grocery shopping, she uses a motorized cart but at times avoids leaving her home due to depression.

(R. at 26–27).

### B. Relevant Medical Evidence

The ALJ summarized Plaintiff's medical records and symptoms related to her physical impairments as follows:

> [Plaintiff] was hospitalized in 2016 for pneumonia after which she endorsed chronic fatigue and developed CHF with reduced ejection fraction of 35% to 40% in August 2018 (Exhibit 2F at 35, 141, 143). [Plaintiff]'s treatment has been complicated by prior issues of noncompliance with her antihypertensive regimen (Exhibit 2F at 143) as well as cardiology follow-up (Exhibit 10F at 51). Nonetheless, ejection fraction improved to 48% by March 2021. A cardiac MRI performed in May 2021 was negative for amyloid heart disease, and a stress test conducted in July 2021 was negative for ischemia (Exhibit 9F at 28). Both blood pressure and lower extremity edema have come under better control. Consequently, [Plaintiff] is noted as doing "okay" from a cardiac standpoint (Exhibits 9F at 19 / 11F at 19). She was initiated on CPAP therapy due to her cardiac history though sleep apnea is described as mild

in nature (Exhibit 2F at 15). Lifestyle modifications including smoking cessation and daily physical activity also have been advised (Exhibits 8F at 52 / 9F at 29).

Treatment records also document allegations of night sweats and unintentional weight loss with daily migraines (Exhibit 10F at 46). Migraines seem to have been attributed to [Plaintiff]'s history of Graves' disease/acquired hypothyroidism dating back to 2008 along with elevated eye pressure for which she has been referred to an ophthalmologist (Exhibits 3F at 131 / 10F at 51) as well as an endocrinologist at one point (Exhibit 4F at 8). Those associated medical records show that [Plaintiff]'s hypothyroidism remains variably controlled, again in part, due to her less than optimal treatment compliance (Exhibits 4F at 8 / 10F at 51) requiring ongoing adjustments of her hormone replacement therapy (Exhibits 1F / 2F / 3F / 5F / 10F / 11F). Nonetheless, as recently as February 2023, [Plaintiff] had no active concerns related to her thyroid (Exhibit 11F at 19, 21).

Other treatment records show [Plaintiff]'s complaints of chronic pain throughout the thoracic and lumbar areas and radicular-type symptoms of the lower extremities with muscular fatigue exacerbated by constant movement and prolonged walking and standing (Exhibit 2F at 26, 68, 49, 85, 91). Lumbar spine x-rays, however, have revealed multilevel degenerative changes of no more than moderate severity (Exhibits 2F at 142 /7F at 4), and there is no evidence of any neuromuscular dysfunction affecting [Plaintiff]'s lower extremities as muscle strength has consistently tested has consistently remained at 4-4+/5 or 5/5 (Exhibits 2F at 22, 37, 51, 93 /7F at 5). Thus, measures in shoulder and back pain control have been limited to physical and manipulative therapy and various medications and TENS unit (Exhibits 2F / 3F / 5F / 10F). [Plaintiff] also complains of radicular shoulder pain complicated by intermittent paresthesia of the hands, greater on the right (Exhibits 8F at 60 / 10F at 14, 39). EMG nerve conduction studies of the upper extremities performed in June 2022 demonstrated findings consistent with bilateral carpal tunnel syndrome, more significant on the right (Exhibit 10F at 26) for which [Plaintiff] subsequently underwent orthopedic evaluation (Exhibit 10F at 36). But no surgery was recommended at that time (Exhibit 10F at 40), and though [Plaintiff] was referred for a second opinion in November 2022 (Exhibit 10F at 52), treatment has remained entirely conservative mostly consisting of injections and night splints (Exhibit 10F).

In order to clarify the nature and severity of any existing physical impairment, [Plaintiff] was referred for a physical examination by the Division of Disability Determination (DDD). Phillip Swedberg, M.D. conducted the examination on April 19, 2022 (Exhibit 7F). [Plaintiff] – described as an "extremely poor historian" with respect to details of her medical history - endorsed hypothyroidism-related problems of fatigue, palpitations, weakness, cold intolerance, poor balance, mood changes, poor memory, lack of focus, and anxiety. She used a TENS unit and took various medications.

3

> On physical examination, blood pressure was recorded as 177/102. Otherwise, Dr. Swedberg noted [Plaintiff]'s examination as age-appropriate and completely normal. [Plaintiff] ambulated with a normal gait and station and was comfortable in both the sitting and supine positions. She could stand on either leg and squat without difficulty. Seated and supine straight leg raise was negative. All range of motion studies were within normal limits. Muscle strength tested as 5/5 throughout, and grip strength was 5/5 bilaterally. All sensory modalities were well-preserved including light touch and pinprick. Heart rate was regular, and lungs were clear.
>
> X-rays taken in connection with Dr. Swedberg's examination revealed multilevel degenerative changes of the lumbar spine most pronounced at the L4-L5 and L5-S1 levels.

(R. at 27–28).

The ALJ also summarized Plaintiff's medical records and symptoms related to her mental health issues as follows:

> *** [Plaintiff] has been diagnosed with both depression and anxiety (Exhibits 6F at 3 / 10F at 19) though the record does not show evidence of any concerted effort at mental health treatment beyond refills of medication from [Plaintiff]'s primary care physician (Exhibits 1F / 2F / 10F) and a psychiatry referral which [Plaintiff] declined (Exhibit 10F at 20).
>
> As such, the only comprehensive psychological assessment of record was performed on behalf of the DDD by Evelyn Rivera, Ph.D. on March 7, 2022 (Exhibit 6F). When asked about the nature of her disability, [Plaintiff] reported physical health concerns as well as depressive symptoms largely secondary to her health problems. She received medication from her primary care physician as of the summer 2021 which was not effective.
>
> At the time of the examination, [Plaintiff] resided with her husband and youngest child, age 11, who helped her with daily living activities that included cooking, cleaning, laundry, and groceries. She also relied on her husband for some personal care needs due to her back issues. [Plaintiff] limited driving to short distances because of anxiety.
>
> [Plaintiff] presented as adequately dressed and groomed. Mood appeared depressed as evidenced by [Plaintiff] crying profusely during the interview and often losing focus and forgetting things. Energy was visibly stressed and [Plaintiff] would move around a lot, sitting and standing often. She became frustrated easily when unable to answer questions quickly; however, she was able to persevere in answering questions and continue until she could answer the question. [Plaintiff] was alert and fully-oriented. Thoughts and speech were logical and coherent. There was no evidence of any thought content abnormalities. Intellectual functioning was estimated as average.

> Based on her examination, Dr. Rivera diagnosed a depressive disorder with anxious features. Her assessment of [Plaintiff]'s mental functioning does not really identify the effects of these mental impairments, certainly not in the form of precise limitations but seem to suggest no more than moderate functional limitations. Dr. Rivera did note some possible deficits with sustained concentration and pace, social interaction problems, and a reduced stress tolerance arising from [Plaintiff]'s depressed mood, low energy, and anxiety symptoms. Again, there is little evidence of ongoing treatment to attempt to effectively control the alleged symptoms of psychological disorders, but given [Plaintiff]'s diagnosis it is reasonable to conclude that these areas of mental functioning are likely to be affected as Dr. Rivera opined, and therefore, her opinion evidence is persuasive.

(R. at 29).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through February 19, 2021. (R. at 27). She has not engaged in substantial gainful activity since the alleged onset date. (*Id.*). The ALJ also determined that Plaintiff has the following severe impairments: congestive heart failure (CHF), essential hypertension, obstructive sleep apnea, hypothyroidism, migraines, lumbar degenerative disc disease, degenerative joint disease of the shoulders, carpal tunnel syndrome, anxiety, and depression. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, meets or medically equals a listed impairment. (R. at 32).

The ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following limitations: (1) standing and/or walking for about 4 hours in an 8-hour workday; (2) frequently climbing ramps and stairs, stooping, kneeling, crouching, and crawling; (3) never climbing ladders, ropes, or scaffolds; (4) frequently handling, fingering, and feeling bilaterally; (5) frequent reaching with the right upper extremity; (6) occasional concentrated exposure to extreme heat, dust, odors, fumes and pulmonary irritants; (7) avoid unprotected heights and dangerous machinery; (8) performing tasks that are not at a production rate pace and without strict performance quotas; (9) occasional superficial contact with coworkers and supervisors ("superficial

5

>contact" is defined as retaining the ability to receive simple instructions, ask simple questions, and receive performance appraisals but as lacking the ability to engage in more complex social interactions such as persuading other people or rendering advice); (10) no interaction with the general public; (11) no jobs involving teamwork or tandem tasks; and (12) occasional changes to a routine work setting defined as 1-2 per week with those changes explained in advance.

(R. at 34).

The ALJ determined that Plaintiff is unable to perform her past relevant work as a caseworker. (R. at 38). The ALJ relied on testimony from a Vocational Expert ("VE") to determine that given Plaintiff's age, education, work experience and RFC, she was able to perform work that existed in significant numbers in the national economy, such as a merchandise marker, mail clerk, or a router. (R. at 39). Consequently, the ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since February 19, 2021. (R. at 40).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

6

### III. DISCUSSION

Plaintiff argues that the ALJ reversibly erred by purporting to adopt the opinions of the state agency psychologists, Karla Delcour, Ph.D. and Robin Murry-Hoffman, Psy.D., but failing to recognize the distinction between limiting the quantity of time spent with an individual and limiting the quality of the social interactions. (Doc. 7 at 5–8). Plaintiff also contends that the ALJ reversibly erred by failing to consider possible reasons why she may not have complied with her anti-hypertensive regimen, as required by SSR 16-3p. (*Id.* at 8–11).

The Commissioner counters that the ALJ appropriately considered the prior administrative medical findings from agency doctors as part of the residual functional capacity analysis. (Doc. 9 at 4–9). According to the Commissioner, the ALJ also properly noted Plaintiff's history of non-compliance with hypertension medications. While factually correct, the noncompliance happened before the relevant period, and the ALJ's decision does not indicate any adverse inference was taken based on this non-compliance. Thus, the ALJ had no duty to further inquire as to why Plaintiff was non-compliant. (*Id.* at 10-11).

### A. Social Interaction Limitations

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from [her] impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). When determining the RFC, the ALJ must evaluate several factors, including medical evidence, medical opinions, and the plaintiff's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). In doing so, the ALJ must resolve conflicts in the record. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). To that end, an ALJ "is only required to include in the residual functional

7

capacity those limitations he finds credible and supported by the record." *Beckham v. Comm'r of Soc. Sec.*, No. 1:19-cv-576, 2020 WL 5035451, at *7 (S.D. Ohio Aug. 26, 2020) (quoting *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020)). And an ALJ is not required to adopt a medical opinion verbatim. *See, e.g.*, *Poe*, 342 F. App'x at 157 ("Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."); *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."); *Cooper v. Comm'r of Soc. Sec.*, No. 2:18-CV-67, 2018 WL 6287996, at *5 (S.D. Ohio Dec. 3, 2018), *report and recommendation adopted*, No. 2:18-CV-67, 2019 WL 95496 (S.D. Ohio Jan. 3, 2019) ("Certainly, an ALJ is not required to mirror or parrot medical opinions verbatim."). The court must affirm if substantial evidence supports the ALJ's decision, even if the court would have resolved conflicts in the record differently *See Christine G. v. Comm'r of Soc. Sec.*, No. 2:22-cv-1969, 2023 WL 5717417, at *6 (S.D. Ohio Sept. 5, 2023).

> The ALJ summarized the assessments of Drs. Delcour and Murry-Huffman as follows:
>
> DDD psychologist, Karla Delcour, Ph.D. evaluated [Plaintiff]'s mental condition based on the evidence of record on March 20, 2022 (Exhibits 1A / 3A). In Dr. Delcour's opinion, [Plaintiff] has the "severe" mental impairment of depressive, bipolar and related disorders. [Plaintiff] experiences a mild limitation in her ability to understand, remember, or apply information. She has a moderate limitation in her ability to interact with others. [Plaintiff] also has a moderate limitation in her ability to concentrate, persist, or maintain pace and adapt or manage oneself. Dr. Delcour concluded that [Plaintiff] can perform 3-4 step tasks without fast-pace demands away from the distractions of others in a non-public, structured, and predictable work setting where interactions with coworkers and supervisors are brief and superficial and changes can be explained. These findings were affirmed on reconsideration by DDD psychologist, Robyn Murry-Hoffman, Psy.D. (Exhibits 5A / 8A).

8

(R. at 29–30).

In evaluating Drs. Delcour and Murry-Hoffman's opinions, the ALJ found their conclusions as to Plaintiff's mental function persuasive, determining:

> The DDD reviewing psychologists' conclusions as to [Plaintiff]'s mental functioning are persuasive and to the extent they are consistent with the objective record, their findings have been incorporated into the residual functional capacity discussed at Finding No. 5. For example, Drs. Delcour and Hoffman precluded [Plaintiff] from performing tasks with fast-pace demands, and given [Plaintiff]'s complaints of poor focus whether secondary to her thyroid disorder (testimony) or mood disorder, such a restriction is appropriate to fully account for her consultative examination performance during which [Plaintiff] was noted to lose focus and require questions to be repeated often. [Plaintiff] also demonstrated a low stress tolerance by getting easily frustrated during Dr. Rivera's interview (Exhibit 6F at 4), and she receives little to no mental health treatment suggesting [Plaintiff] has limited coping skills. Therefore, it is also appropriate to further restrict [Plaintiff]'s functional capacity with a limitation for performing jobs which involve minimal levels of stress, e.g., occasional changes explained in advance. Drs. Delcour and Hoffman also limited [Plaintiff] to working in a nonpublic setting where social interactions with coworkers and supervisors is brief and superficial though this limitation has been adjusted for vocational definition. As such, including a restriction in the residual functional capacity discussed below for no public interaction and no more than occasional superficial contact with coworkers and supervisors with no teamwork or tandem tasks, when considered collectively, are sufficient to ensure that any interpersonal interactions [Plaintiff] would be compelled to have as part of her actual job duties would be sufficiently "brief and superficial."

(R. at 30; *see also* R. at 98, 110, 122, 135 (state agency psychologists' opinions)).

As a result, the ALJ included the following limitations in Plaintiff's RFC: "occasional superficial contact with coworkers and supervisors ('superficial contact' is defined as retaining the ability to receive simple instructions, ask simple questions, and receive performance appraisals but as lacking the ability to engage in more complex social interactions such as persuading other people or rendering advice;" "no interaction with the general public;" and "no jobs involving teamwork or tandem tasks." (R. at 34). Plaintiff challenges this determination, arguing that a limitation to "occasional" interactions with co-workers and supervisors was not opined by the state

9

agency psychologists, and is ultimately less restrictive than limiting Plaintiff to "brief superficial" interactions. (Doc. 7 at 7). She says this constitutes reversible error because the ALJ found the psychologists' opinions persuasive but did not explain his modification to the RFC. (*Id.*, citing W*ood v. Comm'r of Soc. Sec.*, No. 3:18-CV-76, 2019 WL 1614591, at *3 (S.D. Ohio Apr. 16, 2019), *report and recommendation adopted*, No. 3:18-CV-76, 2019 WL 1958663 (S.D. Ohio May 2, 2019) ("the ALJ must meaningfully explain why certain limitations are not included in the RFC determination, especially when, as here, such limitations are set forth in an opinion the ALJ weighs favorably.")). The Undersigned does not agree with this assessment.

To begin, courts recognize a distinction between an opinion that limits the quantity of time a plaintiff interacts with others and an opinion that limits the quality of those interactions. *See, e.g.*, *Jomo T. v. Comm'r of Soc. Sec. Admin.*, No. 3:21-CV-105, 2022 WL 3446342, at *4 (S.D. Ohio Aug. 17, 2022) (collecting cases) ("Indeed, courts have routinely recognized the distinction between limiting the *quantity* of time spent with an individual with the limitation relating to the *quality* of the interactions . . . ." (emphasis in original)); *Corey v. Comm'r of Soc. Sec.*, No. 2:18-CV-1219, 2019 WL 3226945, at *4 (S.D. Ohio July 17, 2019) ("Significantly, limiting the quantity of time spent with an individual does not accommodate a limitation relating to the quality of the interactions."). As relevant here, "occasional contact" falls into the quantity category, and "superficial contact" falls into the quality category. *See, e.g.*, *Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-CV-18, 2018 WL 6257432, at *4 (S.D. Ohio Nov. 30, 2018) (quoting *Hurley v. Berryhill*, No. 1:17-cv-421-TLS, 2018 WL 4214523, at *4 (N.D. Ind. Sept. 5, 2018) ("'Occasional contact' goes to the quantity of time spent with [ ] individuals, whereas 'superficial contact' goes to the quality of the interactions."), *report and recommendation adopted*, No. 2:18-CV-018, 2019 WL 133177 (S.D. Ohio Jan. 8, 2019). Because of the distinction, this Court has found reversible error

10

when an ALJ finds an opinion limiting a plaintiff to "superficial contact" persuasive, but fashions the RFC as "occasional contact" without an explanation for the modification.  *See, e.g.*, *Jamie H. v. Comm'r of Soc. Sec. Admin.*, No. 3:21-CV-005, 2022 WL 1984872 (S.D. Ohio June 6, 2022) ("ALJ Jones' attempt to accommodate the consultative psychologists' additional restriction of superficial interactions by limiting Plaintiff to occasional interactions with supervisors and coworkers is unavailing."); *Lindsey*, 2018 WL 6257432, at *4 ("The terms 'occasional' and 'superficial' are not interchangeable . . . Thus, the absence of any explanation [for substituting 'occasional interaction' for 'superficial contact'] requires remand." (internal citations omitted)).

Plaintiff cites to this line of cases, arguing that her case is the same.  (Doc. 7 at 7–8).  But it is not.  Significantly, the ALJ did not substitute "occasional contact" for "superficial contact" in the RFC determination—he used both terms to describe the type of contact Plaintiff could have with her coworkers and supervisors.  (R. at 34 (limiting Plaintiff to "occasional superficial contact with coworkers and supervisors")).  And while true the psychologists did not opine that Plaintiff should be restricted to "occasional" interactions with others, it is unclear why Plaintiff would be prejudiced by the ALJ limiting the quantity of her interactions with others in addition to the quality.  Accordingly, this issue does not present a reversable error.

Plaintiff similarly attempts to challenge the ALJ's exclusion of the term "brief" in Plaintiff's RFC, fundamentally asserting that the ALJ replaced the word "brief" with the word "occasional."  (*See* Doc. 10 at 1–2).  Yet, this specific argument was seemingly raised for the first time in Plaintiff's reply brief.  (*Compare* Doc. 7 at 7 (generally arguing a difference between quantitative and qualitative limitations on social contact—"including a limitation to 'superficial' interaction'") *with* Doc. 10 (specifically arguing "occasional" and "brief" are not synonyms)).  And "[r]eply briefs are not designed to provide an opportunity to present new arguments because the

11

nonmoving party is generally unable to respond to the reply brief." *Lorrison v. Berryhill*, No. 18-CV-10289, 2019 WL 1324247, at *5 (E.D. Mich. Mar. 25, 2019) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)). True, Plaintiff cited an out-of-circuit case that discussed the term "brief" as referring to the duration of a social interaction in a similar context in her statement of errors. (*See* Doc. 7 at 8, citing *Cote v. Colvin*, No. 16-CV-57-SLC, 2017 WL 448617, at *7 (W.D. Wis. Feb. 2, 2017) (remanding where the ALJ did "not explain his reasons for only limiting the quantity and not the quality or duration of plaintiff's social interaction"). But she did not more fully develop an argument, so as to put the Commissioner on notice, that the ALJ improperly substituted the word "occasional" for "brief" until her reply. (*Compare* Doc. 7 *with* Doc. 10); *see Lorrison*, 2019 WL 1324247, at *5 (holding an issue raised for the first time in a reply brief was insufficient to put the defendant on notice that it could have responded to the argument). *See also McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (internal citations omitted). As such, Plaintiff has arguably waived this specific issue.

Yet even were this argument properly raised, the Undersigned still finds no error in the ALJ's exclusion of the word "brief" and inclusion of the word "occasional." For one, "brief" has no regulatory definition, nor was the term defined in the state agency psychologists' opinion. (R. at 98, 110, 122, 135); *see Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-02370, 2022 WL 721455, at *16 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted*, No. 3:20-CV-2370, 2022 WL 716105 (N.D. Ohio Mar. 10, 2022); *but see Charlee N. A. v. Comm'r of Soc. Sec.*, No. 2:22-CV-3085, 2023 WL 312791 (S.D. Ohio Jan. 19, 2023) (noting the term "brief" requires no

explanation beyond its common meaning), r*eport and recommendation adopted*, No. 2:22-CV-3085, 2023 WL 1766096 (S.D. Ohio Feb. 3, 2023).  In contrast, the word "occasional" does have a specified meaning in the social security context.  SSR 83-10 (defining "occasionally" as "occurring from very little up to one-third of the time").

And, contrary to Plaintiff's argument, the ALJ did not say he replaced the word "brief" with the word "occasional."  Rather, the ALJ acknowledged the state agency psychologists' opinions that Plaintiff should be limited to brief and superficial social interactions, and explained that he adjusted this limitation for vocational definition.  (R. at 30); *cf. Charlee N. A.*, 2023 WL 312791, at *4 (remanding where the ALJ excluded a limitation to brief contact but there was no greater explanation of his treatment of the opined social interaction restrictions).  Namely, the ALJ included multiple social interaction limitations: no interactions with the public, no more than occasional superficial contact with coworkers and supervisors, and no teamwork or tandem tasks in the RFC.  (R. at 30).  And he defined "superficial contact" as "retaining the ability to receive simple instructions, ask simple questions, and receive performance appraisals but as lacking the ability to engage in more complex social interactions such as persuading other people or rendering advice."  (R. at 34).  Courts have found similar restrictions sufficient to account for qualitative limitations on social interactions.  *See, e.g.*, *Metz v. Kijakazi*, No. 1:20-CV-2202, 2022 WL 4465699, at *9 (N.D. Ohio Sept. 26, 2022) ("A limitation to superficial interaction, therefore, excludes interactions that would require more than brief interaction, as superficial interaction excludes thoroughgoing, in-depth, comprehensive, or detailed interactions. The limitation to superficial interaction reasonably encompasses a prohibition against interactions that go beyond brief interactions."); *Driggins v. Comm'r of Soc. Sec. Admin.*, No. 3:22-CV-00963-JJH, 2023 WL 2987936, at *8 (N.D. Ohio Mar. 6, 2023) (holding an RFC sufficiently accounted for the qualitative

recommendation that a plaintiff could have only brief and superficial interactions with others when it included limitations to occasional interactions, no persuading or negotiation, and no team or tandem tasks). More still, while Plaintiff isolates "occasional" as the problematic word in the RFC, the ALJ explained his holistic view: "[W]hen *considered collectively*, [the RFC limitations] are sufficient to ensure that any interpersonal interactions [Plaintiff] would be compelled to have as part of her actual job duties would be sufficiently 'brief and superficial.'" (R. at 30 (emphasis added)).

As such, the ALJ adequately explained his treatment of the opinions, enabling the Undersigned to follow his reasoning. *See Davis v. Commissioner of Soc. Sec.*, No. 2:19-CV-265, 2019 WL 5853389, at *5 (S.D. Ohio Nov. 8, 2019) ("Ultimately, the ALJ must build an accurate and logical bridge between the evidence and his conclusion." (citation omitted and internal quotation marks)), *report and recommendation adopted*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020). The Undersigned finds no error in the ALJ's treatment of the state agency psychologists' opinions that requires remand.

### B. Social Security Ruling (SSR) 16-3p

When a Plaintiff alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating those symptoms. *See* 20 C.F.R. § 404.1529 Social Security Ruling (SSR) 16-3p, 2016 WL 1119029, *3 (March 16, 2016).[1] First, the ALJ must determine whether the individual has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical

---

[1] Soc. Sec. R. (SSR) 16-3p, 2016 WL 1119029, which "provides guidance about how [the SSA] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms," superseded SSR 96-7p and became applicable to decisions issued on or after March 28, 2016. *See* SSR 16-3p, 2017 WL 5180304 (October 25, 2017) (clarifying applicable date of SSR 16-3p).

14

evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. *See also* 20 C.F.R. § 404.1529(c)(3).

In performing this assessment, the ALJ is not required to analyze all seven factors but must show that he considered the relevant evidence. *Roach v. Comm'r Soc. Sec.*, No. 1:20-cv-01853-JDG, 2021 WL 4553128, at *10–11 (N.D. Ohio Oct. 5, 2021). The ALJ's assessment of an individual's subjective complaints and limitations must be supported by substantial evidence and be based on a consideration of the entire record. *Rogers*, 486 F.3d at 247 (internal quotation omitted). Nonetheless, it remains the province of the ALJ and not the reviewing court to assess the consistency of subjective complaints about the impact of a plaintiff's symptoms with the record as a whole. *See id.* Therefore, "absent a compelling reason," an ALJ's credibility/consistency determination will not be disturbed. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

In considering an individual's statements describing the intensity and persistence of symptoms, Social Security Ruling (SSR) 16-3p provides:

> We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities for an adult . . . Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.
>
> In contrast, . . . if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on

15

> this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints . . . .

SSR 16-3p. According to SSR 16-3p, an ALJ may consider whether a claimant "may not be able to afford treatment and may not have access to free or low-cost medical services" when attending to an individual's treatment history. *Id.*

Plaintiff asserts that the ALJ "failed to consider why [Plaintiff] may not have complied" with her anti-hypertensive regimen, in violation of SSR 16-3p. (Doc. 7 at 10–11). Specifically, the ALJ should have considered treatment notes which stated Plaintiff experienced difficulties following her anti-hypertensive regimen because of insurance issues. (*Id.*; *see* R. at 537 (treatment note stating Plaintiff "has been more compliant with her antihypertensives but there has been some difficulty with compliance because of insurance issues and not having them.")). Because the ALJ failed to consider the reason why she was non-compliant with her prescribed treatment, Plaintiff says remand is appropriate. (Doc. 7 at 11). The Undersigned disagrees.

The ALJ discussed Plaintiff's congestive heart failure (CHF) and hypertension at step two, finding both to be severe impairments. (R. at 27); *see* 20 C.F.R. §404.1520(c), § 416.920(c). As part of this discussion, the ALJ stated:

> [Plaintiff] was hospitalized in 2016 for pneumonia after which she endorsed chronic fatigue and developed CHF with reduced ejection fraction of 35% to 40% in August 2018 (Exhibit 2F at 35, 141, 143). The claimant's treatment has been complicated by prior issues of noncompliance with her antihypertensive regimen (Exhibit 2F at 143) as well as cardiology follow-up (Exhibit 10F at 51). Nonetheless, ejection fraction improved to 48% by March 2021. A cardiac MRI performed in May 2021 was negative for amyloid heart disease, and a stress test conducted in July 2021 was negative for ischemia (Exhibit 9F at 28). Both blood pressure and lower extremity edema have come under better control. Consequently, the claimant is noted as doing "okay" from a cardiac standpoint (Exhibits 9F at 19 / 11F at 19).

(R. at 27).

16

While true, the ALJ noted Plaintiff's non-compliance with her anti-hypertensive regimen without express mention of her insurance difficulties, it is unclear how this omission prejudices Plaintiff. The ALJ found Plaintiff's CHF and hypertension to be severe impairments regardless and noted that Plaintiff's non-compliance was "prior." (R. at 27, citing R. at 537). Indeed, the record that references Plaintiff's non-compliance due to insurance issues was completed in July 2020, and her alleged date of disability was not until February 19, 2021. (R. at 25). And after discussing this prior non-compliance, the ALJ highlighted that "[n]onetheless, [Plaintiff's] ejection fraction improved to 48%" in March 2021—an increase from where her ejection fraction was in 2018. (R. at 27, citing R. at 534, 536, 454). The ALJ also considered treatment notes that reported Plaintiff as "doing 'okay' from a cardiac standpoint" during the relevant period. (*Id.*, citing R. at 1795 (April 2022 note stating plaintiff "is doing okay from cardiac standpoint"), 1953 (February 2023 note stating "[n]o active cardiac symptoms reported")). So, mention of Plaintiff's prior non-compliance does not appear to impact the ALJ's step-two determination, given his explanation of Plaintiff's subsequent medical history during the relevant period and his ultimate decision about her severe impairments.

More importantly, the ALJ did not find the "alleged intensity and persistence of [Plaintiff's] symptoms are inconsistent with the overall evidence of record" due to Plaintiff's prior non-compliance with her anti-hypertensive regimen. SSR 16-3p; (*see* R. at 37–38). Rather, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably have been expected to cause the alleged symptoms; however, the extent of (physical and mental) limitation alleged is largely unsubstantiated by convincing objective medical evidence or clinical findings." (R. at 37). Particularly, he noted that "findings of no active cardiac symptoms, no active thyroid concerns, well-controlled blood pressure and lower extremity edema and improved ejection

fraction consistent with only mildly reduced LV function bely the extent of limitation alleged." (*Id.*). Accordingly, non-compliance with her anti-hypertensive regimen that occurred prior to Plaintiff's alleged date of disability did not factor into ALJ's analysis. And SSR 16-3p requires an ALJ consider the reason for non-compliance only when he makes a finding that an individual's symptoms are inconsistent with the overall evidence in the record on the basis of treatment non-compliance. Therefore, the ALJ was under no duty to further inquire into or expressly consider why Plaintiff may not have been compliant with her prescribed treatment.

In sum, the ALJ properly explained his treatment of the state agency psychologists' opinions concerning Plaintiff's social interaction limitations, and he was under no duty to further explain his consideration of the reasons why Plaintiff was not compliant with her anti-hypertensive regimen prior to the relevant period. Accordingly, the Undersigned finds no error that requires a remand.

### IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **DENY** Plaintiff's Statement of Errors (Doc. 7) and **AFFIRM** the Commissioner's decision.

### V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties' written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

18

evidence, or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Date: July 25, 2024					/s/ Kimberly A. Jolson
							KIMBERLY A. JOLSON
							UNITED STATES MAGISTRATE JUDGE